# EXHIBIT  A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
------------------------------------------------------------------X

DANA A. SMITH,

                 Plaintiff,

-against-

WYETH PHARMACEUTICALS, INC.,

                 Defendant.

------------------------------------------------------------------X

**FILED MC**

JUL **1 9** 2007

ROCKLAND COUNTY
CLERK'S OFFICE

Date Filed: 7/19/2007
Index No. 2007 06116

**SUMMONS**

Plaintiff designates
**ROCKLAND COUNTY**
as the place of trial

The basis of the venue is
**CONDUCT
COMPLAINED OF AND
PLAINTIFF'S
RESIDENCE**

To the above named defendants:

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: Carle Place, New York
      July 16, 2007

                THE LAW OFFICE OF STEVEN A MORELLI

                STEVEN A. MORELLI
                Attorney(s) for Plaintiff
                One Old Country Road, Suite 347
                Carle Place, New York 11514
                (516) 393-9151

TO:   Wyeth Pharmaceuticals, Inc.
       401 North Middletown Road
       Pearl River, New York 10965

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
------------------------------------------------------------------x

DANA A. SMITH,

Index No. 2007-010116

Plaintiff,

-against-

**FILED MC**

WYETH PHARMACEUTICALS, INC.

JUL 1 9 2007 **COMPLAINT**

**ROCKLAND COUNTY**
**CLERK'S OFFICE**

Defendant.

------------------------------------------------------------------x

Plaintiff DANA A. SMITH, by and through his attorneys, The Law Office of Steven A. Morelli, complaining of the Defendant herein, alleges as follows:

## PRELIMINARY STATEMENT

1.   Approximately 90% of upper management at the Wyeth Pharmaceuticals facility in Pearl River, New York is white. Fraternization, characterized by discriminatory favoritism, has created an environment at Wyeth whereby black employees are excluded from promotion into upper management, paid less, harassed, and retaliated against due to nothing more than the color of their skin, and their complaints go unanswered.

2.   This is a civil action for violations of state protected rights brought pursuant to New York Executive Law § 296, 42 U.S.C. § 1981, and further contains any other causes of action that can reasonably be inferred from the facts set forth herein. Plaintiff is seeking damages based upon Defendant's unlawful discrimination causing Plaintiff to suffer financial, physical, emotional, and psychological damages.

-1-

## PARTIES

3.   Plaintiff DANA A. SMITH, at all times hereinafter mentioned, was and still is a resident and domiciliary of the County of Rockland and State of New York.

4.   Upon information and belief, Defendant WYETH PHARMACEUTICALS, INC. ("Wyeth"), was and still is a foreign corporation duly authorized to do business in the State of New York, with an office located at Pearl River, County of Rockland, State of New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

5.   American Cyanamid, a corporation, was taken over by American Home Products, a corporation, in 1996.

6.   American Home Products became Wyeth in or about 2003.

7.   All references to "Wyeth" in this Complaint are to be construed as also referring to American Cyanamid or American Home Products to the extent that any allegations refer to events that occurred prior to 2003.

8.   Plaintiff is a 34-year-old African American male.

9.   Wyeth hired Plaintiff in 1989. Wyeth promoted Plaintiff in 1991 to the position of

Pharmaceutical Operator. In his capacity as Pharmaceutical Operator, Plaintiff always received excellent performance evaluations and was never the subject of any disciplinary action.

### *Initial Discriminatory Acts by Robert "Bob" Bracco*

10.    Robert "Bob" Bracco ("Bracco"), former Department Head in Wyeth's Centrum® manufacturing department, is recognized as a biased individual who uses crafty methods to conceal his discriminatory intent, such as strategically disseminating disciplinary action toward black workers, and placing blacks in only the supervisory roles and support roles he chooses, in an attempt to appear non-discriminatory, while the outstanding majority is persecuted, harassed, suspended, and terminated. Braccos is known for targeting blacks and has instructed his direct reports to "go after" certain employees, the majority of whom were black. He has taunted black workers who challenged his discriminatory tactics to sue him because, as he said, they could not prove that he discriminated against them. Bracco is a defendant in, or the subject of, at least one other discrimination lawsuit of which Plaintiff is aware.

11.    In or around June 2002, supervisor William "Bill" Shafer ("Shafer") approached Bracco on behalf of Plaintiff, and stated that Plaintiff was a good worker with good presentation skills, and strongly recommended that Plaintiff be awarded a position as Temporary Trainer. This position would place Plaintiff on the same promotional track as other white workers who were given the opportunity to temporarily perform this role, only to be made permanent supervisors or trainers at a later date. Bracco agreed with Shafer's suggestion

and told Shafer that he would give Plaintiff the opportunity.

12.    On August 28, 2002, a Centrum Silver® batch, and part of a subsequent batch, were incorrectly compressed after the wrong tool was installed on a compression machine by employees other than Plaintiff. Plaintiff was not responsible for releasing tools for use, inspecting the tools, nor for installing the tools on compression machines. Once the set-up workers perform these tasks, they then inform the supervisory staff that the machine is ready for use, and the tools can no longer be removed or inspected by Pharmaceutical Operators prior to use. The compression machine could not have been used by Plaintiff or any other Pharmaceutical Operator without the approval of the set-up workers. The batch would not have been lost if the set-up workers performed their duties correctly.

13.    On September 9, 2002, Bracco sent out an email message indicating that Plaintiff and ten other individuals were required to attend a meeting to be held on September 12, 2002 regarding the lost batches.

14.    On September 12, 2002, Plaintiff and six of the individuals involved with the batch were disciplined. Two of the white set-up workers who were actually responsible for the incident (they installed and inspected the tools used) were not disciplined (Thomas Rock and Art Karatka). True to form, both Rock and Karatka were eventually awarded supervisory positions as Wyeth.

-4-

15.    Plaintiff recognized the disparity of treatment toward all implicated and realized that a suspension would be made a permanent part of his employment record, which could then be used to bar him from future promotional opportunities. Plaintiff expressed this concern to the Union who took no action. Therefore, Plaintiff retained counsel, who wrote a letter dated October 1, 2002 on Plaintiff's behalf. This letter utterly stunned Bracco, who decided that Plaintiff's suspension would be changed to a verbal warning in his record. After this incident, Bracco became more cautious around Plaintiff and held a disingenous amicable disposition, with an underlying *persona non grata* attitude toward Plaintiff.

16.    In or around November 2002, Shafer told Plaintiff that due to the August 2002 incident outlined above, Bracco had stated that it would not be a good idea to award Plaintiff the opportunity to become a Temporary Traniner. Plaintiff realized that now Bracco was actually using the incident as a pretext to limit Plaintiff's future promotional opportunities. The job was then awarded to William Lyons even though Plaintiff was actually chosen to fill the position prior to the August 2002 incident. This, despite that Plaintiff was not even responsible for the tools used which caused the incident!

17.    Mr. Lyons used his new role to obtain a permanent supervisory position with another company. Thus, the position was once again available, and Shafer approached Plaintiff regarding the position.

18.    In or around June 2003, Bracco used Plaintiff's desire to obtain a managerial position as

an opportunity to appear non-discriminatory, and he promoted Plaintiff to the position of Temporary Training Supervisor. In his capacity as Temporary Training Supervisor, Plaintiff was responsible for training Wyeth employees with respect to the different aspects of operations and maintenance within the Wyeth manufacturing facility located in Pearl River, New York. The position reported to Bracco.

19. As a result of his placement in this position, Plaintiff confirmed his previous assessment that Bracco exhibited a calculated hostile animus toward black workers, and witnessed Bracco's discriminatory methods in a supervisory capacity.

20. From October 2003 to March 2004, Plaintiff was on a medical leave of absence due to the fact that Plaintiff suffers from a form of cancer and was then receiving chemotherapy treatments.

21. Plaintiff learned that the Department Head of his department (the Pharmaceuticals Department) had changed from Bracco to Walter Wardrop ("Wardrop") while Plaintiff was on medical leave. Bracco and Wardrop are extremely close friends and associates, for it was Bracco who was instrumental in promoting Wardrop from a supervisory role to the Production Coordinator role, from which Wardrop became a department head.

### Discriminatory Acts by Walter Wardrop

22. Wardrop is also known as a discriminatory individual who favors his white coworkers while utilizing his power, contacts, and ability to be clandestine in order to keep black

employees from receiving equal employment opportunities such as promotion, overtime allowances, training opportunities, etc. Wardrop is a defendant in, or the subject of, at least five other discrimination lawsuits of which Plaintiff is aware.

23.    Plaintiff returned to work in March 2004, once again performing his Temporary Training Supervisory duties he held when he left work on medical leave in October 2003.

24.    Due to the demands of the position, Plaintiff earned a significant amount of overtime pay since his responsibilities required him to be present on many instances on all three daily shifts at the facility in order to train the employees working on each of those shifts.

25.    Upon Plaintiff's return, Wardrop began to discriminate against Plaintiff as he has done time and time again against Plaintiff's minority coworkers. For example, Wardrop immediately informed Plaintiff that he should not be allowed to remain as a Temporary Training Supervisor for the unjustifiable reason that Plaintiff should "take it easy" following his chemotherapy. Wardrop initiated a campaign of subversive conversations with individuals of authority in order to try to remove Plaintiff from his position of Temporary Training Supervisor.

26.    Parenthetically, when each of the former white Temporary Training Supervisors held the position, they do so, in many cases, for years in order to gain the understanding and experience necessary to advance within the company. For example, Lyons held the

position for approximately six months and went on to obtain a permanent managerial role within another company. Two white operators who held the position prior to Lyons, Michael Hodge and Merrill McIntyre, remained temporary supervisors for more than ten years, at which time they were promoted to permanent roles. A set-up worker, Rick Augsbach, who also returned to work after battling cancer, was made a Temporary Training Supervisor, and more than twelve years later sill holds the position.

27.    As shown above, the temporary supervisor position affords one the opportunity to eventually gain promotions and go on to have more successful careers with Wyeth and other third parties. Wardrop would not let Plaintiff have the same opportunity and wanted him out of the supervisor position.

28.    Wardrop began to tell Plaintiff's direct supervisor and his coworkers that Plaintiff should be "back on the floor" (meaning in his old position of Pharmaceutical Operator) in order to "get better [after his medical leave]." Plaintiff's supervisor, Vonda Hill (an African American) would ask Wardrop why he was asking for such a thing, since Plaintiff's position was justified by his many years of successful service, and the time he spent prior to his leave as Training Supervisor had demonstrated that he was worthy of the position.

29.    Wardrop then began to change his scheme somewhat, and would instead instruct Vonda Hill to cut back on the amount of overtime Plaintiff received as a Training Supervisor, and to cut back on allowing Plaintiff to train employees on all three daily shifts in order to

earn the overtime he previously enjoyed. Wardrop did this despite the history of the Training Supervisor position, which dictated the need for the individual in the position to be available on all three shifts in order to train others, and despite that the white training supervisors had always had the opportunity to earn overtime pay in this manner.

30.     Wardrop's discriminatory behavior lasted for approximately a year, and Plaintiff internalized the effect of Wardrop's behavior without complaining for fear of reprisal, which he had witnessed when his own friends complained about discriminatory behavior in the past. Finally, however, in or about January 2005, Plaintiff decided to apply for another position within Wyeth outside of Wardrop's department in order to escape from Wardrop's control.

31.     Wardrop found out about Plaintiff's application and immediately tried to quash it before it was even considered. He instructed unknown individuals that Plaintiff was not "eligible" to apply for other positions for the utterly fanciful reason that Plaintiff was assigned to "light duty." Plaintiff questioned what had happened to his application, and emails were exchanged between himself, his supervisor Vonda Hill, and departmental trainer and former Centrum® Department Head Gregory Rumpf.

32.     Gregory Rumpf decided to investigate on behalf of Plaintiff. On January 15, 2005, after his inquiries, Rumpf received an email from Vonda Hill informing him that the medical department did not, in fact, have any restrictions placed on his job assignment or on his

eligibility to bid on other positions within the company. This email was forwarded to Plaintiff on January 17, 2005 by Rumpf, with ten simple words as the message: "fyi, why people don't talk to you is beyond me."

33.    In or around May 2005, Plaintiff finally obtained a position in a different department, the Vaccines Department. Upon obtaining the position, Plaintiff summoned the courage to make a complaint of discrimination against his former Department Head, Wardrop, since he felt he would now be free from retaliation.

34.    On November 5, 2005, Plaintiff filed an Intake Questionnaire provided by the Equal Employment Opportunity Commission ("EEOC"). The EEOC never responded to Plaintiff's Intake Questionnaire. Plaintiff also made his claim of discrimination internally at Wyeth through Donna Ranby, a Human Resources Department employee. Donna Ranby failed and refused to investigate Plaintiff's claims and/or to take prompt corrective action.

### Discriminatory Acts of Jeremy Gloth and Robert Holler

35.    In his new position in the Vaccines Department, Plaintiff's supervisor was Elizabeth Marchese, and his Department Head was Robert Holler. There was also another supervisor in the Vaccines Department at this time, Jeremy Gloth, though he was not responsible for Plaintiff's work or the supervision of Plaintiff. For a while, as long as Plaintiff did his job and did not complain, everything seemed fine. However, that changed beginning in October 2006 when Plaintiff realized Gloth was a close friend and associate

-10-

of Wardrop (due to their former relations with each other as coworkers in the Pharmaceuticals Department) and harbored a similar discriminatory animus. Gloth's prejudice toward black employees manifested itself in a number of ways as the following paragraphs illustrate.

36.    Approximately every year, the Vaccines Department shuts down for cleaning and maintenance of its machinery. The shutdown lasts as long as it takes for the machinery to pass compliance specifications. From October 2006 to approximately December 2006, the Vaccines Department was shut down for a period of nine weeks.

37.    During the shutdown, Holler and Gloth, for the first time ever, decided to "loan" departmental employees to other departments on the basis of the employees' seniority, such that the employees with the lowest seniority would have to be trained in and work for other departments during the shutdown while the higher seniority employees went to work and basically did nothing other than answer phones and emails.

38.    Plaintiff was one of the employees to be assigned to work in another department. He was sent to the Pharmaceuticals Department, Packaging Division, where he was required to do little more than sit on an assembly line and package vitamins. However, upon his arrival, Plaintiff was informed that the Packaging Division did not need all of the employees it was assigned, and due to his seniority, Plaintiff merely became a "backup" worker and would only be required to work if called upon.

-11-

39.    Plaintiff seized upon this opportunity to earn overtime in the Pharmaceuticals Department, Manufacturing Division working on "Train 3" in his former position of Pharmaceutical Operator. Plaintiff would work overtime either on the evening hours shift, the "graveyard" shift, or on the weekends. From October 2006 to December 2006, Plaintiff earned significant overtime income to the extent of approximately $900.00 extra pay per week. By this extra income, Plaintiff was earning more money than Gloth, much to the displeasure of both Gloth and Holler.

40.    Gloth found out how much money Plaintiff was earning, and informed Holler that it was unacceptable to him that a black employee was earning more money than he. Holler agreed, and Holler asserted his influence as Plaintiffs Department Head in order to disallow Plaintiff from working the "graveyard" shift where he was earning significant overtime monies due to the nighttime pay differential. Under the Collective Bargaining Agreement, Holler was not permitted to do this, as Plaintiff's overtime hours outside of his normal department could not be controlled by his normal Department Head. Thankfully, Plaintiff did not accede to Holler's directive, nor was he required to.

41.    In or about February 2005, Gloth and Holler then changed course and came up with a new plan to thwart Plaintiff's opportunities to earn extra money. They began sending emails to various individuals, falsely claiming that Plaintiff was responsible for making mistakes in his overtime duties. These emails were sent to the Department Head in charge of Train 3,

to the Human Resources Department, and to various other managerial and supervisory personnel. Gloth believed that these emails were surreptitiously made, but Plaintiff discovered them, and then confronted Gloth about them.

42.    Plaintiff asked Gloth why Gloth was so concerned with his overtime hours and salary considering Gloth was not even his supervisor. Plaintiff then mentioned the emails that Gloth thought were secret. Gloth froze and was unable to speak, apparently stunned that Plaintiff knew about the emails. He failed and refused to respond to Plaintiff's question.

43.    The next day, Gloth called Plaintiff and asked Plaintiff to meet with him in his office. Plaintiff did meet with Gloth as he was curious to get an answer, where Gloth then attempted to show Plaintiff his computer records to try to prove that Gloth did not send any emails. Gloth had apparently secreted or destroyed the emails in a juvenile attempt to cover up his discriminatory actions.

44.    Despite Gloth's attempts to remain anonymous in his scheme to deny Plaintiff overtime, the Union Vice President Jeff Gathers confided in Plaintiff that Gloth had, in fact, been attempting to deny Plaintiff opportunities for overtime.

45.    Gloth and Holler then spoke to Chris DeFeciani, Centrum® Manufacturing Pharmaceuticals Manager, about Plaintiff's overtime in a further attempt to deny Plaintiff the opportunity to earn extra money. They asked DeFeciani to back them up and prevent

-13-

Plaintiff from working overtime. As the next section illustrates, DeFeciani did just that.

46.    However, Gloth also approached Jim Rowan, HR Labor Relations Manager, and falsely accused Plaintiff of receiving preferential treatment due to the fact that Plaintiff's brother was the supervisor of Train 3 where Plaintiff wanted to, and was qualified to, earn overtime. Plaintiff denied these allegations and even offered to work overtime on a different train in order to remove the appearance of any impropriety.

47.    This was not enough for Gloth, though, who continued to try to keep Plaintiff from earning extra monies. Gloth convinced Rowan to implement a new rule, which disallowed an employee from working overtime in a department outside his or her own unless the overtime was deemed "mandatory" by management. This rule was implemented solely to keep Plaintiff from working overtime in the Pharmaceutical Department.

48.    Gathers approached Plaintiff and said, substantially, that because Holler, Rowan, and Gloth do not want him working overtime on Train 3, they implemented this new rule, which has the effect of limiting Plaintiff's opportunities to earn overtime to Train 1, which had "mandatory" overtime scheduled.

49.    Plaintiff was understandably upset and felt persecuted by his discriminators, and worked overtime only on Train 1 as the new rule limited his choices. Plaintiff worked overtime

on Train 1 for several weeks. DeFeciani then started to further cut back on Plaintiff's
opportunities for overtime.

### *Discriminatory Acts of Chris DeFeciani*

50.     In or about the first week of April 2007, the "mandatory" overtime on Train 1 was
"lifted," meaning that the overtime is no longer essential. This had the effect of
eliminating Plaintiff's eligibility to work overtime outside of the Vaccines Department
pursuant to the discriminatory rule that was implemented.

51.     DeFeciani began to cross Plaintiff's name off the overtime sign-up list.

52.     Then, for the weekend of April 14-15, 2007, the overtime again became "mandatory."
Plaintiff signed up during the prior week as usual in an effort to be able to continue
earning extra overtime pay. DeFeciani again unilaterally crossed Plaintiff's name off the
list notwithstanding that the overtime was "mandatory."

53.     On or about April 13, 2007, Plaintiff asked DeFeciani why his name had been crossed off
of the overtime list. DeFeciani refused to talk with Plaintiff. Plaintiff persisted, and
informed DeFeciani of his belief that DeFeciani had joined the others to discriminate
against Plaintiff and deny him opportunities for overtime in favor of white employees.
DeFeciani responded with, "are you threatening me?" Plaintiff responded by saying, "call
it what you want, but you crossed my name off the list and not the other white guys, why
is that?" DeFeciani had no answer to give, so he remained silent.

-15-

54.  Plaintiff then complained to Rowan about DeFeciani's actions. Rowan refused to hear Plaintiff's complaint; therefore, Plaintiff decided to send Rowan an email. In an attempt to eliminate documentary evidence of Rowan's attempt to cover up DeFeciani's discriminatory actions, Rowan emailed Plaintiff in response and asked that Plaintiff call him on the phone, instead of responding to his complaint of discrimination via email.

55.  Plaintiff did call Rowan. During the telephone conversation, Rowan made up various excuses for DeFeciani's actions. One explanation Rowan gave was that there were actually two overtime lists and Plaintiff was on one already, so DeFeciani crossed Plaintiff off the "second" list. This was completely false. There were never two overtime lists as Rowan asserted. Plaintiff told Rowan that this excuse was false. Gathers also confirmed that DeFeciani had made up this story and told it to Rowan in an attempt to hide his own discriminatory behavior.

56.  Plaintiff was also told by DeFeciani and Rowan that overtime hours are only being awarded to individuals within the department. Plaintiff later discovered that this information was totally false. In fact, a white female operator, Patricia Macri-Jennings, who, like Plaintiff, formerly worked in the Centrum® manufacturing area, was and still is awarded overtime outside the department on a consistent basis. Gathers also affirmed that the information Plaintiff received was false, and told Plaintiff that Wyeth had a new product coming out which the Pharmaceutical Department was manufacturing; therefore,

-16-

the department was under pressure and was allowing many employees to work overtime .
. . except, of course, Plaintiff.

### *Marchese Does Not Pay Plaintiff for Overtime Hours He Actually Worked*

57.    In March 2007, lead operator Neil Dillon instructed Plaintiff to come in to work two
hours early. Plaintiff did so as instructed along with two other white employees.
Marchese, Plaintiff's immediate supervisor, did not pay Plaintiff because, as she claims,
she did not "authorize" Plaintiff's overtime. However, the two other white employees did
get paid. Union Representative Eric Ranby became involved and informed Marchese that
she could not block Plaintiff's pay since the other two employees had been paid.
Marchese, however, stuck to her guns, and Plaintiff was never paid for those two hours of
overtime he worked.


58.    Plaintiff has attempted to work within the system in order to assert his rights to earn a
comparable wage to his white employees and to be treated fairly; however, Wyeth
management has failed to address Plaintiff's concerns and stop its employees from
discriminating against Plaintiff, which has necessitated this lawsuit.


59.    As a direct and proximate result of the aforementioned discrimination, the Defendant
caused Plaintiff to suffer loss of earnings and accrued benefits. Plaintiff has additionally
suffered great pain, humiliation, physical, psychological and emotional damages.

## CLAIMS FOR RELIEF

60.    By reason of the foregoing, Defendant has unlawfully discriminated against Plaintiff in his compensation, terms, conditions, and/or privileges of employment, and has denied him the same rights to contract and employment as enjoyed by white persons, because of his race, in that he had a supervisory position taken from him, he was denied the opportunity for advancement, and he was denied overtime opportunities, in violation of N.Y. EXEC. LAW § 296 and 42 U.S.C. § 1981.


**WHEREFORE**, Plaintiff demands judgment against Defendant, where applicable, for all compensatory, emotional, and physical damages, lost pay, front pay, injunctive relief, and any other damages permitted by law, with interest thereon. It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action, and any other relief which to the Court seems just and proper.


Dated:        Carle Place, New York
              July 16, 2007


                        Respectfully Submitted,

                        THE LAW OFFICE OF STEVEN A. MORELLI
                        *Attorneys for Plaintiff*
                        One Old Country Road, Suite 347
                        Carle Place, New York 11514
                        (516) 393-9151


                        Steven A. Morelli


-18-

COPY

LAW OFFICES OF STEVEN A. MORELLI

ALL STATE® INTERNATIONAL  INC
07181-BF • 07182 Bh • 07183 CY • 07184 WH
806 272 0540

Index No.                          Year 20  07

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

DANA A. SMITH,

          Plaintiff,

     - against -

WYETH PHARMACEUTICALS, INC.,

          Defendant.

SUMMONS AND COMPLAINT

**Law Offices Of Steven A. Morelli**

Attorneys for

Plaintiff

One Old Country Road
Carle Place, NY 11514

(516) 873-9550

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:*...............................          Signature.............................................

                                               Print Signer's Name.....................................

*Service of a copy of the within*                                      *is hereby admitted.*

*Dated:*

                          ..............................................
                                     *Attorney(s) for*

*PLEASE TAKE NOTICE*

☐   *that the within is a (certified) true copy of a*
NOTICE OF   *entered in the office of the clerk of the within named Court on*          20
ENTRY

☐   *that an Order of which the within is a true copy will be presented for settlement to the*
NOTICE OF   *Hon.*
SETTLEMENT   *at*                                      *one of the judges of the within named Court,*
            *on*                          20          *, at*                     *.M.*

*Dated:*

                                                        **Law Offices Of Steven A. Morelli**